## WILSON PHILLIPS v. STATE.

No. A-9337. Feb. 25, 1938.
(76 P. 2d 1083.)

H. M. Shirley, of Coalgate, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Sam H. Lattimore, Asst. Atty. Gen., for the State.

DAVENPORT, P. J. The parties in this opinion will be referred to as they appear in the trial court. The defendant Wilson Phillips was by information charged with murder, convicted of manslaughter in the first degree, and sentenced to be imprisoned in the state penitentiary at McAlester, for a period of ten years. The record was properly saved, and from the verdict and judgment the defendant has appealed.

It is admitted by the defendant he shot the deceased, Gene Lankford, from the effects of which wound Lankford died. The substance of the testimony of the state as to what took place between the defendant and deceased just prior to the killing and immediately thereafter is controverted; the evidence being conflicting.

Butch Jackson, a witness called on behalf of the State, stated:

"I live at Coalgate; was employed as foreman by the WPA; I know the defendant Wilson Phillips; I was acquainted with Gene Lankford; I was in Coalgate the night of June 26, 1936; standing near the corner where there used to be a barber shop, I was about ten feet in front of my car; I saw Wilson Phillips and his wife that evening and Gene Lankford and his wife; there was a sign board on the side walk near a post—I hardly know how far the bill board was from the post, it would be a guess—I saw these parties walking along there; when Lankford was about even with the sign I heard him hollow, 'Don't do that,' and he ran. I hear a shot. Lankford went across to the Peoples Drug Store. I heard other shots, there was between four and five shots I figure; I went over to where he was. I did not see the wounds in his body. Walter Clark was there,

and I called Earl Ott over to where the deceased was; I saw the gun in Wilson Phillips hands; the gun you have handed me Wilson Phillips had the night of the killing. I went over to where the deceased had fallen and his wife was there, she kissed him and he said, 'They got me.' Charles Waters, Godfrey, and Mrs. Lankford were there; I remained at the scene until Mr. Slater came with the ambulance."

On cross-examination witness stated:

"Deceased did not give his wife anything while she was there with him. The way I tell it is the way it occurred."

Elbert Green, testifying for the state, stated:

"My name is Elbert Green; I live at Coalgate; I was in Coalgate the night of June 26, 1936; I went to the place where Gene Lankford was on the sidewalk; I saw Mr. Middleton, another fellow and Gene's wife; she knelt down by his side and kissed him, and he said something about I did not think you would come, and they got me, or something like that; he called for water and the Doctor drove up and looked at him and said, 'Send him to the hospital.' I saw Gene's broad brimmed hat lying there, a shot had gone through the crown; I was the first one to get to Mr. Lankford; I was in the restaurant and some one said there was a shooting outside; I had known Gene Lankford for three or four years; I did not know of any trouble between Lankford and Phillips; I did not see Lankford give his wife anything."

Earl Middleton, testifying, in substance, stated:

"I am employed by the WPA; I was in Coalgate the night Gene Lankford lost his life; I was standing there and a fellow came along and we were talking; I saw the flare of the gun across the street and rushed over that way; it looked like it was near the stop sign in the intersection of main street; when I saw the flare of the gun I saw Gene Lankford run across Main street to the drug store; the shots seemed to be directed at Gene Lankford as he ran; after the shot was fired I went down to where Lankford was lying on the side walk; he said, 'They liked to have got you too, honey'; she said something in reply but I did

not get it clear; he said, 'Honey, it was cold blood murder.' After his wife had his head on her knee she wiped his brow and made some statement but I don't know what she said."

On cross-examination witness stated:

"I saw Lankford running and the fire was directed at him; I saw no woman there at the time. Mr. Green was there when I got there, and his wife got to Lankford about the time we got there."

R. D. Godfrey stated his home was at Ardmore:

"I was in Coalgate the night of June 26, 1936, when it is alleged Wilson Phillips shot Gene Lankford; I was going down the street, going north, instead of turning where I should have turned I went a block further and made a 'U' turn; I heard some shots as I came back up the street and saw a man running across the street; he was bleeding; he stopped practically in front of me; I pulled in to the drug store and told them to call an ambulance and remained there until the ambulance came; I saw a lady come up to the party that was shot, and I heard Mr. Lankford say it was cold blood murder. I asked who was shot and they said it was Gene Lankford, and that Wilson Phillips had shot him."

On cross-examination witness stated:

"I saw the party crossing the street at the intersection; Mrs. Lankford was not at the place where Lankford fell when I got there; I saw a man walk up to where Lankford was; I did not see Lankford give his wife anything. I did not know Middleton by name, I saw some man there."

Wesley Ott stated:

"I live at Coalgate, was born and reared in this county; I was on the street the night Wilson Phillips shot Gene Lankford; I am night watchman and had started to make my regular rounds, and at this corner I saw some kids, and some shots were fired and I saw some one running down the street; this fellow hollowed, 'Oh,' and I ran over there and it was Gene Lankford. I made the crowd stand back, and they took him from the street to the hospital. I got Wilson Phillips and put him in jail. Phillips did not make

any statement that I heard. I did not know of any trouble between Phillips and Lankford. There was a light on the street and you could see very well. As this man was coming down the street I heard some shots."

On cross-examination witness stated:

"He heard four or five shots; when I heard the first shot I went to the corner and saw the man running down the street."

Mrs. Homer Dollar stated:

"I am related to Gene Lankford, he was my brother; my husband is Homer Dollar, I was a Lankford before I married. I went to Breco Hospital, at Ada, to see Gene on the 27th day of June, 1936; I got there about 11:30 in the morning, he was conscious at that time. Gene Lankford was 37 years old; he had been married more than once, has two children."

On cross-examination witness stated Gene Lankford's children were by his first wife.

Arizona Lankford, testifying for the defendant, stated:

"I am the wife of Gene Lankford; we were married on the 24th day of December, 1934, and lived with my father for a while. I was sick and Gene and Wilson had some trouble at our house; Mildred Nichols and my sister were present at the time; Wilson jumped up and Gene ran to get his shot gun; I do not know how the trouble came about. I was called by the state at the examining trial. I was in Coalgate on the 26th of June, 1936, with Wilson Phillips and his wife; when I first saw Gene he was in front of the Mayer Hotel; he grabbed me by the neck and wanted me to go with him, he grabbed me and almost jerked me down, and said, 'To hell with the son of a bitch,' that I was going with him; he had a knife; Gene was a heavy set fellow; the knife was open when he gave it to me after he was shot. I have seen the knife a lot of times."

On cross-examination witness stated:

"That when Wilson fired the first shot he was standing kindly to the right of me when Gene jerked my arm; when

Gene started running he started off of Main street, and was on the left side; Wilson and his wife were on the south side of me, and on the south side of Gene when he fired the first shot; I did not see Gene run behind that sign board; when he jerked me down I don't know what happened. When Wilson got after Gene he was nearly behind me (this way); Gene was in his shirt sleeves and Wilson was also in his shirt sleeves; I did not know that Wilson was carrying a gun.

"I did not file a petition for a divorce; I understand the petition had not been filed. I don't know how far the houses are apart, about 30 or 40 yards; I saw Wilson in the yard; I was in the east room when Gene started with the shotgun; I figured he was going to do something, I jumped up and grabbed him; I had not heard of any trouble between them; when he got the shotgun I thought he was going to kill Wilson; I lived with him until the first day of June, and left because he came home and beat up on me, and I came home. I do not know how long he has been back from the hospital.

"I did not hear Gene say when I got to him after the shooting, 'They almost got you, honey, nor did I hear him say it was cold blood murder. Godfrey came up there but left. I know Mr. Middleton but did not know Mr. Green. I saw Butch Jackson that night; I had lifted Gene's head on my knee, and he said, "Sugar, I did not think you would come to me but you did.' He said, 'I guess it was coming to me.' He did not draw a knife on me before the shooting but had his arms around my neck; he grabbed my arm and grabbed me around the neck. I went to a lawyer to get a divorce but the killing occurred before the petition was filed."

Andrew London testified he was 36 years old; he lived west of Coalgate; was in Coalgate the night Gene Lankford was killed:

"I owed Mr. Phillips for a horse and came to town to pay him. I got to the corner of the barber shop and saw Gene Lankford and his wife up on the curb; he was talking and all at once he jerked her arm back and jerked her, and Wilson commenced to shoot; I stepped behind the barber shop."

On cross-examination witness stated he was sure he saw the deceased and the defendant at the time of the shooting:

"I saw John Phillips about 8 o'clock, I went to the house and stayed there quite a while; walked out to the house; I came to town in a car, the road was rough is the reason I did not go out to old man Phillips house in a car. I had bought a mare from Mr. Phillips and was to pay him $25.00. I do not remember seeing Butch Jackson or any of the other parties; I don't remember positively that I saw Mr. Shirley."

Jim Heath also testified for the defendant, and stated he lived near Coalgate; he had a conversation with Gene Lankford concerning Wilson Phillips on Sunday before Gene was killed:

"I was in the court house and Gene Lankford asked me to haul him to a choc joint, and I told him I would, and before we got to Main street he wanted to go to Phillips', said he wanted to get his wife." Objections were made and the court finally said: "Tell what he said about Wilson Phillips? A. He told me to tell Wilson I am going to get him or make his sister come back to me. I communicated the statement to Wilson Phillips."

On cross-examination witness stated he was with Lankford about 20 minutes and defendant jumped on him. Witness was not sure he was very friendly with Lankford. "I did not take Lankford to where he bought a pint of whisky and we drank it."

Frank Witt testified for the defendant and stated he was constable and was acquainted with Gene Lankford and his wife. "I had a conversation with Lankford about Wilson Phillips right at his home near me, within 100 yards of my place.

"This conversation was about the first of June. Lankford was drinking and wanted me to come up there; he and his wife were separated and he wanted me to take the place, and said he was going to take his shotgun and go to Coalgate and kill out the whole Phillips bunch; I reported

this statement to old man Phillips; I am sure Wilson was there in the house at the time I told the old man."

On cross-examination witness stated he was constable at the time he was being examined.

"He asked me if I wanted a drink and I told him I don't mind if I do. The loaded shotgun was there and had only two shells. Wylie Snow was county attorney and Walter Clark was sheriff. I did not tell either of them what Lankford had said; I did not make any application to have him put under a peace bond."

Skud McKinney stated:

"I live at Harden City; I was in Coalgate in May or June and saw Gene Lankford back of his house on the highway; he said Phillips caused trouble between him and his wife and he was going to blow him up, going to put him out. He seemed to be mad; Gene had a violent temper; I told Wilson Phillips what Gene had said."

On cross-examination witness stated:

"I told Wilson Phillips what Lankford had said the next time I saw him. I came down here for some Indians and traded with them for their interest in some lands; one of the Indians, Charley Anderson, lived down below Kiowa. I stopped at Lankfords to get some whisky; we got him out of bed, it was just before daylight, Buck Taylor was with me. We went right away and told Phillips what Lankford had said; we found Wilson at John Phillips'; we went to the Phillips home looking for whisky. I heard about this killing the night it happened. I was in Stonewall at the time."

Eleen Elnoy stated he lived at Phillips':

"I have lived there practically all my life; the Phillips place is about three blocks from Gene Lankford; I had a conversation with Gene on the road about the first of June and he said he would kill the son of a bitch, and said Phillips was no account at all; the trouble was all caused by him in his home, if it was not for the Phillips' he could live with her; he threatened all the Phillips family, was going to blow them up. My occasion for being there was Lankford had beaten up his wife; he came after her but she was gone."

On cross-examination witness stated:

"It was about four o'clock in the afternoon that Lankford was doing this talking; he was mad and drunk. I told Wilson Phillips about what Lankford said."

Lee Fathree, called as a witness for the defendant, stated:

"My name is Lee Fathree, I live in Coalgate on North Broadway about three blocks from Lankford and Wilson Phillips; Lankford talked to me about a week or ten days before he was shot; he came to my house about 8 o'clock, shortly after dark, and I saw he had been drinking; he said Wilson caused all his trouble, and I am going to kill the son of a bitch; I am going to blow the whole damn outfit up; they did me wrong in taking my wife away from me. I replied to him, I would rather he would not talk that way. I told Wilson Phillips what Lankford had said."

Mrs. Wilson Phillips, wife of the defendant, stated:

"I am the wife of Wilson Phillips, the defendant. I was with him the night of the shooting when Gene Lankford was killed; we started to the show and Gene met us at the hotel and stopped Arizona and took her with him, and when we got to the show he turned and walked on and said, 'You are still married'; she came in the show and sit down with us; when we left the theatre we came on down the street to where the trouble occurred, and he said something and wheeled and threw his hand into his right pocket and said, 'I will kill the son of a bitch,' and Wilson shot."

On cross-examination witness stated:

"Wilson had on pants and a white shirt, and Gene had on pants and a gray shirt; when we stopped on the corner Wilson and I were not very far from Gene and his wife; I saw Gene have something, but I do not know what it was; Wilson was standing on the south side of Gene by his left side; I saw Gene jerk his wife before Wilson begin to shoot."

The defendant, Wilson Phillips, stated:

"I have lived in Coalgate something like 20 years. Gene Lankford was my brother in law. Quite a few came and

told me about threats Gene had made against me; I first thought he was joking; Gene was overbearing and kept making these threats until I was afraid of him and went to carrying a pistol. The night this killing occurred me and my wife and sister was going to the show and met Gene at the Mayer Hotel, and he took two or three steps with his wife and she told him to leave her alone, she was going to the show with me.

"I bought three tickets and we three sat down together; in a moment Gene came in and sat down by sister; it looked like he was messing with her and she was afraid of him; he asked her to move away from us; after the show we came out and Gene had his arm around her and kept pulling her and said, 'Gene, go away and leave me alone,' and he got back at her, and I tried to pay no attention about it; when we crossed Main street and got to the corner Gene jerked her and shoved his hand back; I did not know what it was he was reaching for. I understood him to say something about this son of a bitch, and when he jerked her I seen something glitter and I started shooting at him; I feared that my sister's life or my life was in danger, as I had been told he had made threats against me. He had shot at me once before, at that time he got out of his car and hollowed to me, and said, 'I am going to pistol whip your head off,' and did not say another word to me, just hit me two or three times, and fired one shot under that arm on the left side; three or four on the street prevented him from shooting any more. If I am not badly mistaken I fired five shots the night Gene Lankford was killed. The gun is a thumb buster, and when you pull it back and turn it loose, I would not say whether it shot the last time or not."

On cross-examination witness stated:

"When we came up the street that night Mrs. Blanche and I walked behind, and we walked under that street light; if you were not looking you could hardly say whether the deceased had a gun or a knife; he could have had a gun or a knife under his shirt and I would not have seen it; he went down this way and came up and something flashed (indicating) and I did not know what it was and commenced shooting.

"The time Gene Lankford shot me was before he and my sister were married. I don't know which shot struck Gene, if I am not mistaken it was the fourth shot and I did not fire any more; I was about as far as from here to Judge Snow; I did not dodge behind a sign-board; I do not know which shot went through the shop, nor do I know the two shots that went through the board; when I saw something flash in his hand I thought it was time to get started; I cannot say how long it has been since Gene Lankford returned from the penitentiary. I used to deal in horses, but the last two or three years I have not dealt much.

"By Mr. Shirley: We object to the horses. By the Court: You will have to make him your witness. By Mr. Gassaway: I will do that. Q. Didn't you and him have some trouble about some horses? A. No. Q. Don't you know that before he was killed he claimed horses you had sold? A. No, sir. Q. And don't you know yesterday or today you asked Walter Clark if he had a warrant for you for stealing horses? A. No, sir. By Mr. Shirley: We object to that. By the Court: That would not be admissible only to go to the motive. Gentlemen of the jury, you will not consider that except to show the feeling that may have existed between the parties. Q. Wilson, you have been arrested a great many times? By Mr. Shirley: We object to that. By the Court: You may ask him if he has been convicted of any crime involving moral turpitude. Q. I will ask you have you been involved in any crime involving moral turpitude? A. No, sir. You have a record here. Q. You have never been in a federal jail or penitentiary; all your time has been in the county jail at Coalgate? A. For whisky; I did 91 days in the Coal county jail for that. Q. Isn't it a fact that for several years you have carried a six shooter? By Mr. Shirley: We object to that. By the Court: That would only be good to show who was the probable aggressor in the matter. It isn't true that when I fired the first shot this boy started to run; when I shot two or three shots he hollowed, and he was coming straight toward me; I fired at him two or three shots, but did not hit him; it must have been the fourth shot that hit him, after that is when he hollowed; when he jerked his wife flat I fired the first shot at him—in a way yes and in a way no—my sister was between Lankford and I when the difficulty started; he didn't start to run until he hollowed and started across the street, but walked plenty pert and I stood there

and looked at him. Butch Jackson was there and I said to him, take this gun, I have shot a man, and call Walter Clark. One of the McGinnis boys was there and said, 'There is Willis.' I did not shoot between the cars."

On recross-examination the defendant stated:

"Some people were sitting in a car, I don't know who they were: I did not see Andrew London that night. Butch Jackson was there at the Palace and wasn't on the street when I shot."

George Willard, testifying for the defendant, stated:

"I live at Coalgate." After several objections:

"By the Court: Did Lankford make any threats against Wilson Phillips? A. He said he was going to blow the Wilson outfit up. I told Wilson the next day about what Lankford had said. In a way I am friendly with the Phillips'."

Elam Pebsworth testifying, stated:

"I was acquainted with Gene Lankford, and also acquainted with Wilson Phillips. Gene came in one day and said he was going to shoot a man and called me to the back door and said, 'This is the man I am going to shoot,' and I said, 'You can't do that here.' The man was Wilson Phillips." On cross-examination witness stated Gene said he was the man; Wilson came in the shop.

Wilson Phillips, the defendant, was recalled for further direct examination, and stated:

"My sister came to me for protection; Mrs. Ellington brought her to my house, Gene had beat her up until she could not walk; there was a hole in her leg."

On recross-examination witness stated:

"I could not be exact as to how long ago that was, but it was the night sister came in and Gene came and got her and made her go home that night; I was there when he came and let her go back with him. Q. In order to test your memory a little bit, did you ever sell a man named Arnold a pair of bay mares in Tulsa? By Mr. Shirley: Object to that. Will prejudice the jury. By the Court: Overruled.

By Mr. Shirley: Exceptions. A. I do not know him, I did not sell any mares in Tulsa at no time."

O. C. McMillan, testifying for the defendant, stated:

"I am undersheriff; one day I was called by Gene Lankford at Phillips on account of some trouble. We got down there and saw Gene and his wife; I talked to her quite a bit; I could not say whether his wife was beat up on that occasion, she had bruises on her neck and around on her in places; Gene did not tell me what had happened. She came back to the office with me; I don't remember what happened."

On cross-examination witness stated:

"I believe it was in May of the year this case was being tried. I knew Gene Lankford at the time. Q. I will ask if at that time you had a transaction on a team of bay mares? By Mr. Shirley: Objected to as incompetent, irrelevant and immaterial. By Mr. Gassaway: I will make him our witness and will show he gave a mortgage on the very mares Wilson Phillips sold. By Mr. Shirley: We object to that. By the Court: To show knowledge go ahead. By Mr. Shirley: Exception. Q. Did he, Mr. McMillan? A. He did not give a mortgage but Earmin Raines did. That was on the mares before Gene did. They were bay mares, and one would weigh about eleven hundred and one nine something. Q. At any time did Lankford report to the sheriff's office that these mares were stolen? A. Yes, sir. He wrote us a letter, I believe he wrote me a letter to me. By Mr. Shirley: I want to file an objection. By the Court: Overruled. Exception. Q. He was at that time in the penitentiary at El Reno and wrote you about the mares? A. No, sir. By Mr. Threadgill: Comes now the defendant and moves to strike all this testimony about the mares for the reason that it is incompetent, irrelevant and immaterial, and asks the court to instruct the jury to that effect. By the Court: Overruled. By Mr. Threadgill: Exceptions."

Arizona Lankford was recalled, and testified as follows:

"After they brought me home they come and got me and took me back home; the reason I went back he drew a knife on me, put his arms around my neck. I have the knife now. The knife you exhibit is not the knife he had. I did

not return to my home of my own free will and accord; witness stated the trouble happened out at my sisters house; my sister was in bed sick; she was living in a little house I had moved from. I don't know whether he came to my father's house or not. He stuck the knife in my side and said, 'You son of a bitch you are coming home with me'; Wilson and his wife were at the house at the time taking care of my sister who was sick. Q. Is this the same knife Gene Lankford had when he was killed? A. Yes, sir. Q. And it is in the same condition it was that night? A. Yes, sir. It was open when he gave it to me. He had a knife in his hand when I got to him; neither Mr. Green or Mr. Godfrey was there when I got to him."

Albert Arnold, called in rebuttal by the state, stated:

"My name is Albert Arnold; I live in West Tulsa; I have seen the defendant twice; I bought a pair of mares from him. By Mr. Shirley: Objected to as incompetent, irrelevant and immaterial, and tends to impeach the state's own witness. They made Wilson Phillips their witness on that proposition. By the Court: Overruled. By Mr. Shirley: Exceptions. By Mr. Shirley: Hasn't proved anything was stolen yet. By the Court: Overruled. By Mr. Shirley: Exception. I bought two mares from Wilson Phillips; I have been down here attending the trial, think I came Friday, have been here a day or two; I have seen the defendant and shook hands with him; Ralph Fisher was with me and we went to Ralph Fishers and stayed three or four days; he did not give me a title to the mares when I bought them; he said, 'You know the Bishop boy'; I don't remember whether he told me his name or not; he is the man that sold me the mares, one would weigh about one thousand and the other 1,200 pounds. By Mr. Shirley: We renew our objection. No evidence to show that Gene Lankford owned any mares. By the Court: Overruled. By Mr. Shirley: Exception."

On cross-examination by Mr. Shirley:

"Q. Were you ever in the penitentiary? A. No, sir. I saw Wilson Phillips in Tulsa; I did not get his name; I have been in the business of buying mules and horses a long time and never took a bill of sale in my life; I claim to be a business man; I sell mules and horses, and that is all I do. Since I have been here Mr. Phillips asked me what

I knew about this case and I said nothing; that was old man Phillips; he said, 'Are you sure he was the boy,' and I said, 'I will swear to the truth, it was him,' and he said, 'You had better not swear that.' "

On recross-examination witness stated:

"When I bought these mares I was buying a lot of stuff. I don't buy stolen property if I know it. I know there is a lot of stolen property in this country. Some times I ask questions and some times I don't. By Mr. Shirley: Defendant moves to strike all of this testimony on the ground that it is incompetent, irrelevant, and immaterial. By the Court: Overruled. By Mr. Shirley: Exception."

Walter Clark, a witness for the state, stated:

"My name is Walter Clark; I was sheriff on the 20th day of June, 1936; I went with Gene Lankford to Tulsa, Okla., searching for these mares; I found this old man that just testified; Wilson Phillips during the trial asked me if I had a warrant for him for stealing horses. By Mr. Shirley: We object to that. By the Court: Overruled. Exception. I told him I did not have a warrant; that was about June 20, 1936; we had a letter from deceased while he was in the reformatory, and after he got out he came to see me; it must have been six months before he got out that he wrote this letter about the mares; I did not know that for four or five months after he got out he lived in the house with Wilson Phillips' family; he lived there somewhere; as far as I know they were friendly. Mr. Threadgill: Comes now the defendant and moves to strike the testimony of this witness for the reason that it is incompetent, irrelevant and immaterial, and tends to prove no issue in this case. By the Court: Overruled. By Mr. Threadgill: Exception. By the Court: Gentlemen of the jury, it is permitted to go before you for the only purpose to show motive and who was the probable aggressor at the time of this difficulty."

The foregoing is the substance of the testimony.

The defendant has assigned three errors as follows:

"1. The verdict of the jury is not supported by the evidence and is contrary to law.

"2. The court erred in overruling the defendant's demurrer to the state's testimony in chief.

"3. The court erred in overruling the defendant's objections to the introduction of testimony tending to show that the defendant stole and sold a pair of mares belonging to the deceased while the deceased was in prison in El Reno, Okla., which was prejudicial to the rights of the defendant."

The defendant in his brief argues at length that the court erred in admitting incompetent, irrelevant, and immaterial testimony not a part of the case, but relating to the actions of the defendant in other matters. The defendant urges that the court permitted the state to question the defendant on immaterial crimes and matters not growing out of, or related to, the charge of murder, which was incompetent and tended to prejudice the jury against this defendant, and defendant insists that this evidence insinuating that he had committed other crimes, where no proof was furnished to sustain them, was prejudicial to his defense to such an extent that he is entitled to have his case reversed.

We cannot agree with the defendant that the admission of the testimony complained of was such an error as would entitle him to a reversal. Most of the testimony complained of by the defendant was introduced for the purpose of showing a motive actuating the defendant to take the life of the deceased. Some of the testimony complained of was immaterial and foreign to the issues joined in the case for which the defendant was being tried, and was inadmissible. The testimony complained of is set out in full in this opinion.

In Reynolds v. State, 49 Okla. Cr. 215, 292 P. 1046, in the second paragraph of the syllabus, the court said:

"The admission of incompetent evidence is not grounds for reversal, unless it affirmatively appears from the record that the appellant was injured thereby." Littleton v. State, 19 Okla. Cr. 461, 200 P. 716; Mayse v. State, 38 Okla. Cr. 144, 259 P. 277.

After a careful examination of the record we do not believe the admission of the testimony complained of preju-

diced or injured the defendant's right before the jury. It is possible that it may have influenced the jury to the extent of fixing the punishment at ten years.

It is next urged by the defendant that the verdict is contrary to law, and is contrary to and not sustained by the evidence. We cannot agree with this contention. The defendant admits he fired the shots that took the life of the deceased, Gene Lankford, and as a defense he insists the deceased had grabbed the sister of the defendant, and the wife of the deceased, around the neck and jerked her down, and used the word s— o— b—; as the deceased jerked his wife down, the defendant saw something in deceased's hand, and he then began shooting. The reason given for his quick action in shooting was that the defendant at different times had threatened to blow up the Phillips family, and threatened to do bodily harm to the defendant or take his life, and he believed from the standpoint of the defendant it was time for him to begin shooting. Other witnesses claim they saw the shooting and saw the deceased running until he fell on the sidewalk. The wife of the deceased testified when he fell he had a knife in his hand, and that he gave her the knife. Neither of the other witnesses saw the knife. This brought about a conflict in the testimony of the defendant and the eyewitnesses, and the wife of the deceased; the wife testifying the deceased had a knife, and the defendant testifying he saw something in deceased's hand before he fired. Other witnesses stated they did not see anything in deceased's hand, and did not see the deceased give the knife to his wife.

This court has often held that conflicting issues of fact are for the sole determination of the jury. Adams v. State, 54 Okla. Cr. 363, 21 P. 2d 1075.

"Conflicting issues of fact are for the sole determination of the jury. A conviction will not be disturbed on appeal because of conflicts in the evidence, if the evidence adduced reasonably tends to support the verdict and judgment." Pickett v. State, 35 Okla. Cr. 60, 248 P. 352.

In Underwood v. State, 36 Okla. Cr. 21, 251 P. 507,508, in the fourth paragraph of the syllabus, this court said:

"Conviction can be reversed as not supported by evidence only if no substantial evidence tends to show guilt, or evidence is so insufficient that jury must have acted from partiality, passion, or prejudice."

The jury is the exclusive judge of the weight of the evidence, and if there is a clear conflict in the evidence, or it is such that different inferences can properly be drawn from it, this determination will not be interfered with unless it is clearly against the weight of the evidence. Campbell v. State, 23 Okla. Cr. 250, 251, 214 P. 738; Choate v. State, 37 Okla. Cr. 314, 258 P. 360.

The record fails to disclose that the jury was influenced by passion or prejudice. The court in its instructions clearly declared the law applicable to the facts in the case, and the jury, after hearing the evidence, the instructions of the court, and the argument of counsel, by its verdict found the defendant guilty. We hold there is sufficient testimony to sustain a conviction.

In view of the fact that the defense in this case was self-defense, and that the state was permitted over the objection of the defendant to introduce certain evidence with reference to the larceny of some horses and other actions of the defendant, the testimony admitted over the objection of the defendant, and for which he insists the case should be reversed, may have influenced the jury in fixing his punishment at ten years. Considering all the facts and circumstances in the record, we believe the punishment inflicted is excessive, and that justice would be properly met by a modification of the judgment from ten years to five years in the state penitentiary, and, as modified, the judgment is affirmed.

DOYLE and BAREFOOT, JJ., concur.